**SCHWABA LAW FIRM**
Andrew J. Schwaba (NC SBN 36455)
212 South Tryon Street
Suite 1725
Charlotte, NC 28281
(704) 370-0220 (telephone)
(704) 370-0210 (facsimile)

**NICHOLSON LAW FIRM P.A.**
Edward H. Nicholson, Jr. (NC SBN 36123)
212 South Tryon Street
Suite 1725
Charlotte, NC 28202
(704) 333-2529 (telephone)

**FISHER & KREKORIAN**
R. Kevin Fisher (California SBN 131455)
2121 Park Drive
Los Angeles, CA 90026
(310) 862-1220 (telephone)
(310) 388-0805 (facsimile)

## UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| SUE RODRIGUEZ, DEBORAH SUMLIN, LAURIE AMAGAN, TAALIBA WARDEN, NICK NICHOLS, STEED ROLLINS, DEBBI HOUSTON, COURTNEY DUSSEAU, VITO ANDRISANI, RUTH GABAUER, MIRANDA TAYLOR, ANTHONY ANNESKI, LORI JOACHIM, Individually and on behalf of all persons similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>EXPERIAN SERVICES CORP., EXPERIAN INFORMATION SOLUTIONS, INC., EXPERIAN HOLDINGS, INC., CPL HOLDINGS, | **Case No.:   2:15-CV-3553**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF CALIFORNIA CONSUMER REPORTING AGENCIES ACT, CALIFORNIA CREDIT SERVICES ORGANIZATIONS ACT, FEDERAL CREDIT REPAIR ORGANIZATIONS ACT, FALSE ADVERTISING, INTENTIONAL MISREPRESENTATION, AND AND NEGLIGENT MISREPRESENTATION**<br><br>**DEMAND FOR JURY TRIAL** |

1

```
INC.,  LOWERMYBILLS.COM INC.,        )
STEPHEN BRIAN HEYMANN,               )
STEVE KRANZLER, MITCHELL             )
VINER, and DOES 1-20,                )
                                     )
        Defendants                   )
                                     )
```

Plaintiffs, Sue Rodriguez, Deborah Sumlin, Laurie Amagan, Taaliba Warden, Nick Nichols, Steed Rollins, Debbi Houston, Courtney Dusseau, Vito Andrisani, Ruth Gabauer, Anthony Anneski, Lori Joachim and Miranda Taylor ["Plaintiffs"], by their attorneys, make the following allegations based upon knowledge with respect to their own acts and based upon information and belief with respect to other matters:

## INTRODUCTION

1.    LowerMyBills Inc. is a self-described "marketing leads generator" and consumer bounty hunter whose businesses founded on luring, wrangling and capturing consumer's personal and financial information and then selling and trading the consumer's personal financial information to third parties (a.k.a. partners) in exchange for a bounty payment and the partners agreement to share its own customers personal information back with LowerMyBills. Between 2007 and 2012, LowerMyBills, and various other Experian PLC entities including Experian Information Solutions Inc., Experian Services Corporation, and Experian Holdings, Inc., used Experian's position in the consumer credit services industry coupled with promises to help consumers erase their debts, to induce consumers seeking to resolve their debts and improve their credit ratings with Experian, to provide Experian their personal financial information and trust Experian and "LowerMyBills" to unite the consumer with an "approved debt relief partner". Between 2007 and 2013, Credit Alliance Group, Inc., headquartered in Dallas,

2

Texas, was one of LowerMyBills so-called "approved debt relief partners" to whom defendants lured, wrangled, captured and sold thousands of consumers personal financial information and otherwise facilitated consumers entrusting their personal savings and retirement funds to CAG to erase their debts and improve their credit scores. Defendants failed to disclose to these consumers that their information would be sold to third parties such as CAG. Defendants also confused, misled and or failed to disclose to consumers that CAG was in fact prohibited by law from engaging in the very "debt relief" services for which defendants endorsed CAG as an "approved partner."

2.     Defendants sold the financial and personal information of thousands of consumers across the country to CAG as part of the scheme. Defendants also obtained CAG's own contracted customers per private personal information from CAG without the customer's knowledge or express consent. When consumers have discovered and complained to defendants about defendants unauthorized sale of the consumer's information to third parties, defendants have responded by asserting that no control over their third-party "partners" use the consumers personal information sold to the third parties by Defendants. This is not the only time Experian has been involved in dangerously harmful unauthorized sale of consumers personal and financial information – in 2013, another Experian subsidiary sold names, Social Security numbers and other sensitive personal information of at least hundreds of thousands of Americans to third parties in Vietnam with a history of involvement in identity theft. Using the LowerMyBills and Experian logos on its marketing and contract materials and representing itself as a member of the FDIC, CAG promised to hold customers funds in trust and use the funds to negotiate debt settlements at pennies on the dollar. Hard-working Americans in

3

California and across the country (including elderly, widows, disabled military veterans, recent college graduates and families trying to get by,) entrusted thousands of hard-earned dollars to CAG, including drawing funds from their retirement accounts at an early withdrawal penalty in order to resolve their debts and improve their credit score with Experian. Instead, CAG's president and CEO failed to place customers funds in trust accounts, commingled and used customer funds for personal benefit and millions of dollars of consumers personal savings disappeared, some face lawsuits from the creditors and their credit scores fell further leaving them in a far worse position than before they visited LowerMyBills website or entrusted their money to CAG.

3.      As a result of Defendants deceptive trade practices, thousands of honest hard-working consumers who entrusted their retirement and savings to CAG, in order to resolve their debts and improve their credit scores, lost millions of dollars in personal savings entrusted to CAG, incurred further costs, and suffered further damage to their personal credit ratings – leaving many in a far worse position, when it was revealed to the consumers (after CAG's filing of chapter 7 bankruptcy in late 2013) that CAG's entire business and "approved partnership" with defendants was a sham and their funds had disappeared. At present, the Experian Defendants continued to fail to disclose to CAG's customer victims the exact nature of the role Experian played in the CAG scheme and have made no effort to disclose or repair the harms to hundreds and thousands of honest, hard-working Americans whose life savings and credit scores ("with Experian") have been devastated as a result – in some circumstances these Defendants appear to continue to attempt to shield and hide their deceptive trade

4

practice schemes by spuriously claiming that such fraudulent acts are protected industry trade secrets.

**PARTIES**

4.      Plaintiff Sue Rodriguez is a resident of Watsonville, California. She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in January of 2012 in order to maintain and improve her credit record, credit history and credit rating.

5.      Plaintiff Deborah Sumlin is a resident of Charlotte, North Carolina.  She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in July of 2009 in order to maintain and improve her credit record, credit history and credit rating.

6.      Plaintiff Laurie Amagan is a resident of Raleigh, North Carolina.  She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in September of 2010 in order to maintain and improve her credit record, credit history and credit rating.

7.      Plaintiff Nick Nichols is a resident of Duncan, South Carolina.  He entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in June of 2011 in order to maintain and improve his credit record, credit history and credit rating.

8.      Plaintiff Taaliba Warden is a resident of Union, New Jersey.  She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in July of 2008 in order to maintain and improve her credit record, credit history and credit rating.

9.     Plaintiff Courtney Dusseau is a resident of Macomb, Michigan.   She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in June of 2010 in order to maintain and improve her credit record, credit history and credit rating.

10.     Plaintiff Vito Andrisani is a resident of New Jersey. He entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian  in July of 2012 in order to maintain and improve his credit record, credit history and credit rating.

11.     Plaintiff Steed Rollins is a resident of Durham, North Carolina.   She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in July of 2009  in order to maintain and improve his credit record, credit history and credit rating.

12.     Plaintiff Ruth Gabauer is a resident of Franklin, Tennessee.  She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian  in July of 2010 in order to maintain and improve her credit record, credit history and credit rating.

13.     Plaintiff Miranda Taylor is a resident of Raleigh, North Carolina.   She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in order to maintain and improve her credit record, credit history and credit rating.

14.     Plaintiff Anthony Anneski is a resident of Atlanta, Georgia.   He entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and

Experian in July of 2008 in order to maintain and improve his credit record, credit history and credit rating.

15.     Plaintiff Debbi Houston is a resident of Hayward, Wisconsin.  She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in October of 2008 in order to maintain and improve her credit record, credit history and credit rating.

16.     Plaintiff Lori Joachim is a resident of Green Bay, Wisconsin.  She entered into an agreement with Defendant Credit Alliance Group, Inc., LowerMyBills and Experian in May of 2011 in order to maintain and improve her credit record, credit history and credit rating.

17.     Defendant LowerMyBills, Inc., is a Delaware corporation and can be served by serving as registered agent, CT Corporation system, 818 W. 7th St., Second floor, Los Angeles, CA 90017, or wherever it may be found.

18.     Defendant Experian Services Corporation is a Delaware corporation (and the direct employer of Defendant Stephen Heymann, vice president of compliance and information practices for Experian North America), and can be served by serving as registered agent, CT Corporation System, at 1999 Brian St., Suite 900, Dallas, Texas, 75201 – 3136 or wherever it may be found.

19.     Defendant Experian Holdings, Inc., is the Experian entity that technically owned Defendant LowerMyBills between 2005 in October 2012 when it was sold to defendant CPL holdings, LLC (dba "Core Digital Media), and can be served by serving as registered agent, Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE, 19801, or wherever it may be found.

20.     Defendant Experian Information Solutions, Inc., is a Delaware corporation and recipient of a direct law enforcement and regulatory notice of inquiry regarding the conduct and relationship between Experian, LowerMyBills and Credit Alliance Group, Inc., a Texas corporation engaged in a scheme with LowerMyBills and Experian to buy, sell and trade consumers personal information, and induce consumers to entrust funds to Credit Alliance Group, Inc., as an approved debt relief partner of Experian and can be served by serving as registered agent, the Corporation Trust Company, Incorporated Corporation Trust Center, 1209 Orange St., Wilmington, DE, 19801 or wherever it may be found.

21.     Defendant Stephen Brian Heymann, individually, is a former in-house lawyer for Defendant LowerMyBills and is currently employed by Defendant Experian Services Corporation as vice president of compliance and information for Experian North America, a part of Experian PLC, and can be served at his office at 475 Anton Blvd., Costa Mesa, CA, 92626 or wherever he may be found.

22.     Defendant Steve Kranzler, individually, is a former employee of the Experian Defendants and presently CEO of Defendants LowerMyBills, Inc., and CPL Holdings, LLC (dba "Core Digital Media") and can be served at his offices at 12181 Bluff Creek Dr., Suite 250, Playa Vista, CA 90094 or wherever he may be found.

23.     Defendant Mitchell Viner, individually, is a former employee of the Experian defendants and employed by LowerMyBills, Inc., and CPL holdings, LLC (dba "Core Digital Media") and can be served at his offices at 12181 Bluff Creek Dr., Suite 250, Playa Vista, CA 90094 or wherever he may be found.

24.     Defendant CPL holdings, LLC ("Core Digital Media), is a Delaware limited liability company, doing business as "Core Digital Media" and can be served by serving as registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE, 19801 or wherever it may be found.

25.     Plaintiffs do not know the true names, capacities, or basis for liability of Defendants sued herein as John Does 1 through 20, inclusive, as each fictitiously named Defendant is in some manner liable to Plaintiffs. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and therefore allege, that at all relevant times mentioned in this Complaint, each of the fictitiously named Defendants are responsible in some manner for the injuries and damages to Plaintiffs so alleged and that such injuries and damages were proximately caused by such Defendants, and each of them.

26.     Plaintiffs are informed and believe, and thereon allege, that at all times mentioned, each of the Defendants were the agents, employees, servants and/or the joint-venturers of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendants, and the amount in controversy exceeds $5 million.

28.     The court has personal jurisdiction over the Defendants because two defendants reside or have their principal places of business in this District.  Corporate Defendants are authorized to, and do, conduct substantial business in California and the acts and omissions complained of and/or the harm alleged occurred in this District.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1), because a substantial part of the acts and omissions giving rise to this action occurred in this District in Defendant Experian's offices here.

## EXHIBITS

30.     In support of this Petition, the Plaintiffs rely upon and adopt by reference for all purposes the attached exhibits as follows:

A.      Exhibit A - Agreed Final Judgment and Permanent Injunction in State of Texas versus Shane Garner and Credit Alliance Group, Inc.

B.      Exhibit B, Letter of February 11, 2010, from the State of Maine Department of Professional and Financial Regulation, Bureau of Consumer Credit Protection to Experian Information Solutions, Inc. and Steve Kranzler, General Manager, Experian Interactive Media and LowerMyBills.com;

C.      Exhibit C, Letter of February 19, 2010 from Stephen Heymann, Vice President of Compliance and Information Practices, Experian Interactive Media, to the State of Maine, Department of Professional and Financial Regulation, Bureau of Consumer Credit Protection;

D.      Exhibit D, CAG Customer Enrollment Marketing Packet and 2009 contract;

E.    Exhibit E, Letter of November 2, 2011, from the North Carolina Attorney General to CAG regarding CAG's unlawful and criminally prohibited debt relief services in North Carolina;

F.    Exhibit F, Vermont Attorney General's February 23, 2010, "assurance of discontinuance" of illegal debt relief services with CAG signed and filed in Superior Court in Washington County, Vermont.

**FACTUAL BACKGROUND**

31.    Between 2007 October 2012, Defendants LowerMyBills Inc., a wholly-owned subsidiary of Experian, Experian Information Solutions, Inc., Experian Holdings, Inc., and Experian Services Corporation (collectively, Experian) along with individual Defendants Steve Kranzler, current CEO of LowerMyBills and CPL holdings and former manager of Experian Interactive Media) and Stephen Heymann, (Vice President of Compliance and Information practices for Experian North America and Experian Services Corporation), used Experian's position in the consumer credit industry, along with advertisements targeted at consumers with significant credit card debt, to induce consumers seeking to resolve or erase their debts and improve their credit ratings to provide Experian with their financial and other personal information in order to be matched with one of Experian's approved debt settlement partners.

32.    In October 2012, Defendant CPL holdings, Inc. took over ownership of LowerMyBills from Experian through a management buyout. Defendant Steve Kranzler also moved from Experian to become the CEO of CPL Holdings LLC (dba Core Digital Media) and CEO of LowerMyBills as part of the management buyout.

33.     Between 2007 in January 2013, Credit Alliance Group, Inc., (hereafter CAG) a Texas corporation headquartered in Dallas, Texas, was one of LowerMyBills "approved debt relief partners." Defendants deceptively captured and sold the financial and personal information of thousands of consumers across the country to CAG as part of a scheme to induce the consumers to sign debt relief service contracts and entrust their assets to CAG.

34.     Defendants also deceptively captured and sold the private information of consumers to its other debt relief partners and then induce their other debt relief partners to disclose private information of their own customers back to defendants.

35.     Defendant's first lure consumers to the LowerMyBills website with various ads promising:

> *Banks writing off billions in credit card debt*
>
> *Find out how much of your debt can be erased.*
>
> *If you have $10,000 or more in credit card debt, you probably qualified to have a large amount of that debt reduced. Credit card companies don't want you to know this because they are afraid everyone who qualifies will take advantage. If you have credit card debt you may be surprised at how much your debt can be lowered. Reduce your debt.*

36.     Once a consumer was lured to LowerMyBills.com's website, Defendants wrangled the consumers personal information with promises of "bigger savings" and assurances that "you are 90 seconds away from better results!" If the consumer input their personal and financial identifying information into the LowerMyBills.com website to be "matched" with Experian's "approved debt relief partner."

37.     The webpage lures the consumer into providing her personal information one step at a time: the first webpage only asked for the consumer's ZIP Code and amount of debt with no disclosure to the consumer that their personal information may be used or shared with anyone. The consumer was next sent to a second webpage that promised "better results!" as soon as the consumer input her name, email and phone number.

38.     Next, the consumer is sent to yet a third webpage where, in order to obtain the consumer's physical address, the webpage promised "congratulations [consumer's name], you are now one step closer to a debt free life. Please complete this page to qualify for faster debt relief and the most accurate savings." Nowhere did this page disclose that LowerMyBills and Experian efforts to wrangle the consumers personal information were part of a scheme to turn the consumer's sensitive personal and financial information over to third parties in exchange for a bounty payment.

39.     Defendants not only failed to disclose to consumers that the consumer's information would be sold to its CAG "partners", but also failed to disclose that defendants provided the same CAG "partner" with marketing strategy services encouraging even more unwelcome and unauthorized frequent telemarketing solicitations to facilitate CAG closing the consumer into a void and fraudulent customer contract.

40.     Even upon inquiry from law enforcement in the state of Maine, Heymann, Kranzler and the Experian defendants responded by misrepresenting their relationship with CAG and failing to disclose that defendants were actively involved in the procurement of debt relief services including providing CAG with marketing strategy

services to encourage increased telemarketing solicitations in order to facilitate CAG closing consumers into a void and deceptive contract under which the consumer will entrust their hard-earned savings to CAG and requiring CAG to share its customer information back to defendants without the consumer's consent.

41.     Defendants were informed directly by CAG, and failed to disclose to consumers, that CAG had judgments against it for failing financial services laws.

42.     Defendants also continued to sell consumers' information to CAG, and endorse CAG as an approved debt relief partner, even after they were informed CAG had judgments against it for violating financial services statutes.

43.     Today, LowerMyBills continues to use such practices as described above to capture and sell consumers personal and financial information. Now, if a consumer seeking debt relief attempts to leave LowerMyBills website without providing her complete personal information, that attempt is rejected and a conspicuous pop-up window appears on the computer screen asking "are you sure you want to leave this page?" Along with a message from the LowerMyBills.com webpage stating, "if you would like immediate assistance, please call 1-800-765-8664."

44.     While LowerMyBills uses this pop up window to prohibit consumers from leaving their website without providing their complete personal information, LowerMyBills fails to use the same type of pop-up window to disclose how it will use your information, and that it intends to seek a bounty payment for delivering your information to third parties for solicitation purposes. By its own admission, LowerMyBills alleged disclosures are hidden on an entirely separate maze of webpages the consumer may never see, nor agree to, before providing their personal information.

45.     Using the LowerMyBills and Experian logo designs, marketing materials, and contracts, and misrepresenting itself as a member of the FDIC, CAG promised to hold customers funds in trust and use the funds to negotiate debt settlements at pennies on the dollar.

46.     After providing their information on the LowerMyBills website or receiving CAG marketing materials with the LowerMyBills/Experian logos, hard-working Americans in California and across the country (including elderly, widows, disabled military veterans, recent college graduates and families trying to get by) entrusted thousands of hard-earned dollars to CAG in order to resolve their debts and improve their credit score with Experian.

47.     Unknown to consumers, despite its status as an Experian/LowerMyBills "approved debt relief partner," CAG was prohibited by law from offering, contracting or charging consumers for the early services.

48.     CAG's business practices were also prohibited by criminal and civil laws in other states. The state of North Carolina sent CAG cease-and-desist letters cautioning that its business practices constitute a criminal offense but defendants failed to disclose this information to consumers and continued selling North Carolina consumers information to CAG.

49.     The state of Vermont assessed a $40,000 penalty and secured a settlement agreement from CAG filed in state court in Vermont, for its unlawful practices. Despite the unlawful nature of CAG's practices under Vermont law, defendants sold Vermont consumers information to CAG, endorsed CAG as an "approved partner" and failed to disclose CAG's illegal conduct to consumers.

50.     In early 2010, the state of Maine sent a letter directly to Experian, addressed to defendant Experian Information Solutions, Inc. at its Allen, Texas offices (and defendant Steve Kranzler) then President of Experian Interactive Media, and current CEO of defendants LowerMyBills and CPL Holdings), notifying Experian, Kranzler, Heymann, Viner and LowerMyBills that CAG was illegally providing unlicensed debt relief services to consumers in the state of Maine using the Experian and LowerMyBills logos and confusing both consumers, and law enforcement authorities, as to Experian and LowerMyBills ownership in affiliation with CAG.

51.     Upon receipt of this information, while defendant Heymann, vice president of compliance and information practices for Experian, did send a response letter to the state of Maine on Experian's behalf, Kranzler, Heymann, Viner and Experian took no action to disclose to consumers that CAG, it's "approved debt relief partner", engaged in the legal debt relief business practices.

52.     Defendants did not inform residents of Maine ("personally matched or contracted with CAG through LowerMyBills"), about the letter from Maine, the fact that CAG was prohibited by law from providing debt relief services in Maine, or the fact that CAG was not owned by LowerMyBills.

53.     Instead, Defendants continued causing confusion and misunderstanding by matching, endorsing and referring consumers to CAG as an experienced "approved debt relief partner" and continued capturing, selling and trading consumers personal and financial information with CAG.

54.     Defendant Viner, an employee of Experian in February 2010 (and current employee of LowerMyBills), had knowledge CAG confused consumers into contracting

with CAG through the use of Experian and LowerMyBills logos on CAG marketing and contract materials but failed to disclose to those consumers that CAG was neither owned by the Experian defendants, nor authorized to use the Experian defendant's trademarks or logos in February 2010.

55.     The Experian defendants, as well as defendants Heymann, Kranzler and Viner, also continuously solicited consumers for debt relief services between February 2010 and October 2012, without disclosing the defendant solicitations were prohibited by law due to defendant's failure to seek or obtain a registration to engage in such solicitations. The CPL Holdings defendants solicited continuously consumers for debt relief services between February 2010 and October 2012, without disclosing the defendants' solicitations were prohibited by law due to defendant's failure to seek or obtain a registration to engage in such solicitations.

56.     Further, defendant Heymann's letter to Maine (on behalf of Experian, LowerMyBills and Kranzler) falsely and affirmatively misrepresents their relationship with CAG (and their other debt relief partners) to law enforcement authorities for the state of Maine by reporting that "LowerMyBills.com is strictly a lead generator and is not involved in any other way with the provider or their services."

57.     In October 2010, Experian was notified by CAG, in writing, that judgments had been entered against CAG for violation of financial services related laws. Nonetheless, defendants still failed to disclose this information to consumers, continued to endorse CAG as a debt relief services provider, and continued to sell consumers financial and personal information to CAG.

17

58.     While defendants captured and sold consumers private personal information to CAG and represented CAG to consumers as "approved" debt management services partner, defendants continued causing confusion and misunderstanding that CAG was authorized by law and properly registered with the state of Texas (where CAG was headquartered) to provide credit management services.

59.     While defendant sold North Carolina consumers financial and personal information to CAG, and endorsed CAG to North Carolina consumers for debt management services, defendants further failed to disclose that CAG's business practices also violated civil and criminal laws of the state of North Carolina.

60.     Although CAG's contracts and marketing material falsely represented itself to be a "member, FDIC," defendants failed to disclose to consumers that CAG was not in fact, ever a member of the FDIC.

61.     Even after CPL Holdings LLC (DBA "Core Digital Media") took over ownership of LowerMyBills in October 2012, and defending Kranzler took over as CEO of defendants LowerMyBills and CPL Holdings, LowerMyBills continued to sell and trade consumers financial and personal information to CAG in Dallas, Texas, continued to endorse and market CAG's debt relief services to consumers, and took no action to disclose to consumers that CAG engaged in illegal debt relief business practices.

62.     While defendants failed to halt their deceptive trade practices and the illegality of CAG's business and deceptive nature of its contract to consumers, defendants did fly their senior account manager for CAG, Cody Krebs, to Dallas, Texas to entertain CAG's president, Shane Garner, at upscale Dallas nightclubs in order to cultivate defendants' partnership with CAG.

63.     As a result of defendants misrepresentations; failures to disclose; and/or other deceptive trade practices as described herein, defendants sold consumers rights to privacy by capturing, tracking and selling their personal information to third party debt relief partners as "leads" and subjected consumers to repeated unauthorized telemarketing solicitations from those third-party debt relief partners.

64.     By use of the actions and practices described above, defendants further requested and obtained (for defendants own business use and purposes) the private information of consumers that contracted with those third party business partners without those customers knowledge or consent.

65.     The Experian and LowerMyBills defendants, along with defendants Heymann, Kranzler, and Viner have caused confusion and misunderstanding as to LowerMyBills and Experian affiliation, connection, association with CAG for the provision of debt relief services through their advertising and use of the Experian and LowerMyBills trademarks and logos by engaging in the actions and practices described above, the Experian and LowerMyBills defendants, along with defendants Heymann, Kranzler and Viner have caused confusion and misunderstanding as to CAG certification to lawfully provide debt relief services under the laws of the United States Code and the State of California.

66.     By engaging in the practices described above, the Experian and LowerMyBills defendants, along with defendants Heymann, Kranzler, and Viner caused confusion and misunderstanding as to CAG certification to legally provide debt relief services under the laws of the states where the consumers whose information defendant sold and delivered to CAG reside.

67.    As a result of defendant's acts and practices as described herein, consumers signed deceptive and void contracts with defendants' "approved partner" and entrusted their limited financial resources to CAG in order to settle their debts and repair and improve their credit scores with Experian. Instead, CAG's President failed to place customers funds in trust accounts, commingled and used customer funds for personal benefit and millions of dollars of consumers personal savings disappeared, some face lawsuits from creditors and their credit scores fell further leaving them in a far worse position than before.

## **CLASS ACTION ALLEGATIONS**

68. Plaintiffs incorporate all previous allegations as though fully set forth herein.

69. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

70. Plaintiffs bring this case individually and as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a proposed class, [the "federal class"] as follows:

> All United States residents who, at any time prior to the seven years following the filing of this action, purchased any "consumer" or "personal" service from CAG after a referral by the Defendants and who (a) paid in advance of any service before such service was provided or fully performed; or (b) did not receive the disclosures described in 15 U.S.C. § 1679c; or (c) did not receive a written contract with terms as described in 15 U.S.C. § 1679d; or did not receive a cancellation form and other information described in 15 U.S.C. § 1679e.

Excluded from the class definition are: (a) Defendants and any of their officers, directors, and employees and any successors or assigns of same; (b) any person who has a pending suit against a Defendant for any claims asserted herein or

who has compromised such a claim; (c) any current or former person that purchased any "consumer" or "personal" service from the Defendant who subsequently has undergone personal bankruptcy; and (d) any judicial officer or court personnel in this action and their families through the third degree of relationship.

71. Plaintiffs bring this action individually and as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and California Code § 378-384 on behalf of a proposed class [the "California Class"] defined as follows:

> All United States residents who, at any time prior to the seven years following the filing of this action, purchased any "consumer" or "personal" service from CAG after a referral from the Defendants and who (a) paid in advance of any service before such service was provided or fully performed; or (b) did not receive the disclosures described in California Code § 1789.15 et seq.; or (c) did not receive a written contract with terms as described in §1789.15 et seq.; or did not receive a cancellation form and other information described in §1789.15 et seq.

Excluded from the class definition are: (a) Defendants and any of their officers, directors, and employees, and any successors or assigns of same; (b) any person who has a pending suit against a Defendant for any claims asserted herein or who has compromised such a claim; (c) any current or former person that purchased any "consumer" or "personal" service from the Defendant who subsequently has undergone personal bankruptcy; and (d) any judicial officer or court personnel in this action and their families through the third degree of relationship.

72. The members of the federal class are similarly situated to Plaintiff.

73. The members of the California class are similarly situated to Plaintiff.

74. The federal class consists of thousands of persons.

75. The California class consists of hundreds of persons and may reach over a thousand.

76. Common questions of law and fact exist with respect to the federal class. They include:

    a. Whether Defendants are a California Credit Reporting Agency as defined by the California Consumer Credit Reporting Agencies Act ("CCRAA"), California Civil Code Section 1785.1 et seq.

        i. Whether Defendants followed reasonable procedures to ensure maximum possible accuracy of the information in consumer credit reports;

        ii. Whether Defendants provided consumer credit reports to a third party for marketing purposes;

        iii. Whether Defendants violated the CCRAA; and

        iv. Whether Defendants acted in deliberate or reckless disregard of their obligations and the rights of Plaintiffs and other Class members under the CCRAA.

    b. Whether Defendants are a Credit Services Organization as defined by California Credit Services Organizations Act, ("CSOA") Civil Code Section 1789.12 and federal Credit Repair Organizations Act [the "CROA"] 15 U.S.C. §1569 et seq.;

        i. Whether Defendants charged money or received payment for services to class members prior to fully performing the services pursuant to CSOA and CROA;

ii. Whether the Defendants provided to the class members the necessary disclosure forms pursuant to the CSOA and CROA;

iii. Whether the Defendants provided compliant written disclosure forms as required by CSOA and CROA;

iv. Whether the Defendants provided class members with a copy of the cancellation forms as required by CSOA and CROA;

v. Whether the Defendants failed to perform the services within six months of the buyer signing a contract for those services as required by the CSOA;

vi. Whether Defendants made or used any untrue or misleading representations of and about the services of the Defendants and/or whether Defendants engaged in directly and/or indirectly in acts, practices, and/or courses of business that deceived or attempted to deceive Plaintiff and other similarly situated consumers in connection with the offer and/or sale of services of the Defendants, and in particular, as those representations, acts, practices and/or courses of business are set forth in, without limitation, in the paragraphs set forth above pursuant to CSOA and CROA;

vii. Whether CSOA's and CROA's statutory damages provisions apply to the claims of the Class members;

c. Whether Defendants misrepresented the source, sponsorship, approval, or certification of services provided pursuant to the California

Consumer Legal Remedies Act, California Civil Code Section 1750 et seq.;

    i. Whether Defendants misrepresented their association with CAG;

    ii. Whether Defendants represented that the Plaintiffs and Class Members would receive an economic benefit contingent on an event to occur subsequent to the consummation of the transaction;

d. Whether Defendants engaged in unfair business acts and practices pursuant to the California Unfair Competition Law, Business & Professions Code Section 17200 et seq.,

    i. Whether Defendants failed to alert Plaintiffs and Class Members that their private, confidential financial information would be sold to third parties;

    ii. Whether Defendants failed to alert the Plaintiffs and Class Members that they were obtaining the Plaintiffs and Class Members private, confidential financial information of Plaintiffs and Class Members from CAG;

    iii. Whether Defendants misrepresented to Plaintiffs and Class Members their association with CAG;

77.    Common questions of law and fact exist with respect to the California class.  They include:

a. Whether Defendants are a California Credit Reporting Agency as defined by the California Consumer Credit Reporting Agencies Act ("CCCRAA"), California Code Section 1785.1 et seq., and violated the CCCRAA;

    i. Whether Defendants followed reasonable procedures to ensure maximum possible accuracy of the information in consumer credit reports;

    ii. Whether Defendants provided consumer credit reports to a third party for marketing purposes;

    iii. Whether Defendants violated the CCCRAA; and

    iv. Whether Defendants acted in deliberate or reckless disregard of their obligations and the rights of Plaintiffs and other Class members under the CCCRAA.

b. Whether Defendants are Credit Services Organizations as defined in the California Credit Services Organizations Act ["CSOA"], California Civil Code § 1785 et seq.;

    i. Whether Defendants charged fees or received payment for services to class members prior to fully performing the services;

    ii. Whether the Defendants provided to the class members the necessary disclosures;

    iii. Whether the Defendants provided California CSOA compliant written disclosure forms;

iv. Whether Defendants made or used any untrue or misleading representations of and about the services of Defendants and/or whether Defendants engaged in directly and/or indirectly in acts, practices, and/or courses of business that deceive or attempt to deceive Plaintiff and other similarly situated consumers in connection with the offer and/or sale of Defendants' services, and in particular, as those representations, acts, practices and/or courses of business are set forth in, without limitation, in the paragraphs set forth above;

78. The common issues of law and fact of the federal and California Class Members are very similar and are the most significant issues in the case. These common issues predominate over any individual issues, and they can be resolved for all members of the federal class and California class in one action.

79. Plaintiffs' claims are typical of the claims of the federal Class Members and California Class Members. The factual and legal bases for the claims are similar.

80. Plaintiffs will fairly and adequately represent the interests of the federal Class and California Class in that:

a. Plaintiffs' interests do not conflict with those of the Class Members. Plaintiff does not have any relationship with any of the Defendants except as a consumer of and purchaser of the services as described.

b. Plaintiffs and her attorneys have adequate legal and financial resources to prosecute this action diligently. Plaintiffs' counsel can advance the costs of this action.

c. Plaintiffs' attorneys are competent and experienced in class action litigation.

d. A class action is the superior method for adjudicating the claims asserted herein, and a class action will provide a fair and efficient method of adjudicating this controversy. The management of this litigation as a class action will not present any undue difficulties. The claims asserted herein are "negative value" claims (it would cost more to litigate them individually than could be recovered individually), making prosecution of the claims in separate actions by individual members of the class financially impracticable. Separate prosecution of the claims would also be burdensome and inefficient for Counsel and the Court.

## COUNT I – DEFENDANTS' VIOLATIONS OF THE CALIFORNIA CONSUMER REPORTING AGENCIES ACT – CAL. CIVIL CODE § 1785.1 et. seq.

81. Plaintiffs incorporate the allegations above as though fully set forth herein.

82. Plaintiffs and Class members are "consumers" as defined in California Civil Code Section 1785.3.

83. Defendants are a "Consumer Credit Reporting Agency" as defined in California Civil Code Section 1785.3.

84. Section 1785.14 of the California Consumer Credit Reporting Agencies Act requires the following:

Whenever a consumer credit reporting agency prepares a consumer credit report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

85. Section 1785.19 of the California Consumer Credit Reporting Agencies Act requires the following:

Every consumer credit reporting agency, upon written request and the furnishing of sufficient identification to identify the consumer and the subject file, shall create reasonable procedures to prevent a consumer credit report or information from a consumer's file from being provided to any third party for marketing purposes or for any offer of credit not requested by the consumer.

86. Defendants violated California Consumer Credit Reporting Agencies Act, Section 1785 et seq. as described above and as follows:

   a. Defendants failed to take measures to ensure the Plaintiffs and Class Members consumer credit reports were accurate, and actively schemed to make the consumer credit reports inaccurate;

   b. Defendants failed to take measures to prevent the Plaintiffs and Class Members consumer credit reports from being provided to a third party and intentionally provided consumer credit reports to a third party for marketing purposes.

   c. Defendants used Plaintiffs and Class Members consumer credit reports to intentionally target Plaintiffs and Class Members for marketing purposes.

87. Defendants' violations were willful and made with full knowledge of their deceitful nature. Alternatively, Defendants acted in deliberate or reckless disregard of their obligations and the rights of Plaintiff and other Class members.

28

88. Based on the facts alleged in this Count, Defendants have violated the California Credit Reporting Agencies Act, and Plaintiffs and Class Members are entitled to recover their actual damages, including fees charged by and paid to CAG. Defendants' violations in this regard have been pervasive, persistent and longstanding. Plaintiffs and Class members are entitled to punitive damages of not less than $100 nor more than $5,000 for each violation as the Court deems proper.

## COUNT II – VIOLATIONS OF THE CALIFORNIA CREDIT SERVICES ORGANIZATIONS ACT - §1789.10 et seq.

89. Plaintiffs incorporate the previous allegations as though fully set forth herein.

90. Plaintiffs and Class Members are "buyers" and "persons" as defined in California Civil Code §1789.12.

91. Defendants are and acted as a "Credit Services Organization" and "person" as defined in California Civil Code § 1789.12 as they sold or attempted to sell the services of a Credit Repair Services Organization.

92. Civil Code Section 1789.13 of the California Credit Repair Services Organizations Act requires Credit Repair Services Organizations to comply with the following provisions:

A credit services organization, and its salespersons, agents, representatives, and independent contractors who sell or attempt to sell the services of a credit services organization, shall not do any of the following:
(a) Charge or receive any money or other valuable consideration prior to full and complete performance of the services the credit services organization has agreed to perform for or on behalf of the buyer.
(b) Fail to perform the agreed services within six months following the date the buyer signs the contract for those services;
(c) Charge or receive any money or other valuable consideration for referral of the buyer to a retail seller or other credit grantor who will or may extend credit to the buyer, if the credit which is or will be extended to the buyer (1) is upon

substantially the same terms that would have been extended to the buyer without the assistance of the credit services organization;

(d) Make, or counsel or advise any buyer to make, any statement which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, to a consumer credit reporting agency or to any person who has extended credit to a buyer or to whom a buyer is applying for an extension of credit, such as statements concerning a buyer's identification, home address creditworthiness, credit standing, or credit capacity;

(e) Remove, or assist or advise the buyer to remove, adverse information from the buyer's credit record which is accurate and not obsolete.

(f) Make or use any untrue or misleading representations in the offer or sale of the services of a credit services organization . . .

(g) Engage, directly or indirectly, in any act, practice, or course of business which operates or would operate as a fraud or deception upon any person in connection with the offer or sale of the services of a credit services organization.

***

(l) Submit a buyer's dispute to a consumer credit reporting agency without the buyer's knowledge.

93. Civil Code Section 1789.15 of the California Credit Services Organizations Act required the Defendants to include a statement with any contract that included the following provisions:

A complete and detailed description of the services to be performed by the credit services organization for or on behalf of the buyer and the total amount the buyer will have to pay, or become obligated to pay, for the services.

The buyer's right to proceed against the bond under the circumstances and in the manner set forth in Section 1789.18.

The name and address of the surety company which issued the bond.

A complete and accurate statement of the availability of nonprofit credit counseling services.

The statement also required an advisement that inaccurate information may be removed from your credit report, the right to cancel a contract, and the right to sue a credit services organization if it misleads you.

94. Civil Code Section 1789.16 of the California Credit Repair Services Act requires a credit services organization to include various provisions in the contract, including a statement on the consumer's right to cancel the contract, the dates by which the contract will be performed, the length of time for performing the services, and the delivery address where the notice of cancellation is to be sent.

95. Civil Code Section 1789.25 requires every Credit Services Organization to file a registration application, receive a Certificate of Registration form, receive a bond and pay a registration fee from the California Department of Justice before doing business in the state of California.

96. The Defendants violated the California Credit Services Organizations Act, Civil Code Section 1789.10 et seq., as described above, and as follows:

    a. By failing to perform the services prior to accepting payment for those services;

    b. By failing to complete services pursuant to the statutory timeframe for completion;

    c. By requesting the Plaintiffs and Class Members to make untrue statements to obtain credit and or credit relief;

    d. By making misrepresentations to the Plaintiffs and Class Members to induce the Plaintiffs and Class Members to retain their services.

    e. By engaging in a deception in the offer or sale of their credit services organization;

    f.  By failing to provide Plaintiffs and Class Members with the required disclosures described above;

    g.  By failing to obtain the appropriate bond and registration required by statute.

97. The Defendants knew or should have known that CAG failed to comply with Civil Code Section 1789.25 of the California Credit Services Organizations Act.

98. Civil Code Section 1789.21 of the California Credit Services Organizations Act allows any buyer and any person injured by a violation of the title to bring any action for recovery of damages, or for injunctive relief, or both, for actual damages, and in no case less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and costs, and punitive damages.

## COUNT III – VIOLATIONS OF FEDERAL CREDIT REPAIR ORGANIZATIONS ACT – 15 U.S.C. § 1679

99. Plaintiffs incorporate the allegations above as though fully set forth herein.

100.   Plaintiffs and Class Members are "consumers" as defined in 15 U.S.C. § 1679(a)(1).

101.   Defendants are "credit repair organizations" as defined in 15 U.S.C. § 1679a(3)(A).

102.   In violation of 15 U.S.C. 1679b(a)(4) of the Credit Repair Organizations Act, Defendants engaged, directly or indirectly, in an act, practice, or course of business that constituted or resulted in the commission of, or an attempt to

commit, a fraud or deception on persons in connection with the offer or sale of the services of a credit repair organization.

103.    By concealing and failing to disclose their taking of consumers initial payments and doing so before services were performed in violation of 1679b(b) of the Credit Repair Organizations Act, Defendants made misleading and untrue statements about their services as credit repair organizations and undertook practices, and/or courses of business that constituted or resulted in the commission of, or attempts to commit, frauds or deceptions against consumers in connection with the offer or sale of the services of such credit repair organizations in violation of 15 U.S.C. 1679b(a)(3) and 1679b(a)(4) and of the Credit Repair Organizations Act.

104.    Defendants' violations were willful and made with full knowledge of their deceitful nature.

105.    In violation of 15 U.S.C. 1679b(a)(3) of the Credit Repair Organizations Act, Defendants made or used untrue or misleading representations of their services as credit repair organizations.

106.    Defendants' violations of 15 U.S.C. 1679b(a)(3) were willful and made with full knowledge of their deceitful nature.   In addition, Defendants' violations have been pervasive, persistent, and longstanding.

107.    Defendants are credit repair organizations that charged and received from Plaintiffs and Class Members money from the performance of services which it agreed to perform, before such services were fully performed.

108.   Defendants have violated 1679b(b) of the Credit Reporting Organizations Act, and Plaintiffs and Class Members have suffered resulting damages in the amount of all up-front fees and all monthly service fees charged by, and paid to, CAG.

109.   In violation of 15 U.S.C. 1679c(a) and (b) of the Credit Repair Organizations Act, Defendants failed to provide Plaintiff and Class Members with a written statement, separate from any written contract, describing their credit file rights in the manner prescribed by the Credit Repair Organizations Act, and disclosing that:

   a.   You have the right to sue a Credit Repair Organization that violates the Credit Repair Organizations Act.  This law prohibits deceptive practices by credit repair organizations.
   b.   You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.
   c.   The Federal Trade Commission regulates credit bureaus and credit repair organizations.  For more information contact:
         The Public Reference Branch
         Federal Trade Commission
         Washington D.C. 20580

110.   Defendants also failed to maintain a signed statement from the Plaintiffs and the Class Members acknowledging receipt of the foregoing statement in their files for 2 years, in violation of 15 U.S.C. 1679c(c)(1) and (2) of the Credit Reporting Organizations Act.

111.   Defendants failed to give Plaintiffs and Class Members a copy of the disclosure statement required under 15 U.S.C. § 1679e(c).

112.   Based on the facts alleged in this Count, Defendants have violated the Credit Repair Organizations Act, and Plaintiff and Class Members are entitled

to recover all fees charged by and paid to CAG.  Defendants' violations in this regard have been pervasive, persistent and longstanding.

## COUNT IV – VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW – SECTION 17200 et seq.

113.   Plaintiffs incorporate the previous allegations as though fully set forth herein.

114.   Plaintiffs and Class Members are "consumers" as defined in California Business & Professions Code Section 17200 et seq.

115.   Defendants are "persons" as defined in California Business & Professions Code Section 17201.

116.   Plaintiffs and Class Members are serving a copy of this Complaint on the California Attorney General pursuant to Section 17209.

117.   Section 17200 et seq. prohibits unlawful business acts and practices; unfair business acts and practices; fraudulent business acts and practices; unfair, deceptive, untrue and misleading advertising; and any act prohibited by Section 17500.

118.   Defendants violated the California Unfair Competition Law, Section 17200 et seq., as described above and as follows:

a.  By failing to alert the Plaintiffs and Class Members that the information provided to them would be sold to third parties, including CAG and other credit services organizations;

b.  By providing the Plaintiffs and Class Members private, confidential information to third parties, including CAG and other credit services organizations;

c.  By allowing CAG and other credit services organizations to induce Plaintiffs and Class Members to retain their services using the Defendants identities and otherwise reputable goodwill;

d.  By obtaining from CAG and other credit services organizations the private confidential information of Plaintiffs and Class Members;

e.  By failing to alert Plaintiffs and Class Members that they were obtaining from CAG and other credit services organizations the private, confidential information of Plaintiffs and Class Members.

119.  The Plaintiffs and Class Members seek damages according to Section 17206 for actual damages, restitution, punitive damages, court costs and attorney's fees and any other relief the Court deems just and proper.

## COUNT V – VIOLATIONS FOR FALSE ADVERTISING – CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17500 et. seq.

120.  Plaintiffs incorporate the previous allegations as though fully set forth herein.

121.  Plaintiffs and Class Members are "consumers" as defined in California Business & Professions Code Section 17500 et seq.

122.  Defendants are "persons," as defined in California Code Section 17506.

123.  The California Code Section 17500 et seq., made it unlawful for any person, firm, corporation or association to refrain from making any untrue or misleading statements with the intent to dispose of real or personal property or to perform services or to induce the public to enter into any obligation thereto.

124.   The California Business & Professions Code Section 17505 prohibits a person, in an advertisement of goods, to misrepresent the character, extent, volume or type of their business.

125.   California Business & Professions Code Section 17508 prohibits any person doing business in California from making any false or misleading advertising claim.

126.   California Business & Professions Code Section 17509 that requires any person from any advertisement, including any advertisement over the internet, soliciting the purchase or lease of a product or service that requires, as a condition of sale, the purchase or lease of a product or service to conspicuously disclose in the advertisement the price of all those products or services.

127.   California Business & Professions Code Section 17525 made it unlawful for a person with a bad faith intent to use a domain name that was confusingly similar to the name of another without regard to the goods or services of the parties.

128.   Defendants violated the California Business & Professions Code, Section 17500 et seq., as described above and as follows:

   a.   By failing to alert the Plaintiffs and Class Members that the information provided to them would be sold to third parties, including CAG and other credit services organizations;

b. By providing the Plaintiffs and Class Members private, confidential information to third parties, including CAG and other credit services organizations;

c. By allowing CAG and other credit services organizations to induce Plaintiffs and Class Members to retain their services using the Defendants identities and reputable goodwill;

d. By obtaining from CAG and other credit services organizations the private confidential information of Plaintiffs and Class Members;

e. By failing to alert Plaintiffs and Class Members that they were obtaining from CAG and other credit services organizations the private, confidential information of Plaintiffs and Class Members.

129.   The Plaintiffs and Class Members seek damages for actual damages, restitution, punitive damages, court costs and attorney's fees and any other relief the Court deems just and proper.

130.   WHEREFORE, Plaintiffs, on behalf of themselves and Class members, pray for relief as follows:

A.   For an order that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that each of the above-described classes be certified, that Plaintiffs be appointed Class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class;

B.   For an order requiring Defendants to pay actual damages in an amount to be determined at trial;

C.      Under Count I, for actual damages sustained by Plaintiffs and Class members as a result of violation of the CCRAA, including any amounts paid by Plaintiffs and Class members to CAG, and punitive damages of not less than $100 nor more than $5,000 for each violation of the CCRAA as the Court deems proper; costs and attorneys' fees;

D.      Under Count II, for actual damages sustained by Plaintiffs and Class Members as a result of violations of the CSOA, including any amounts paid by Plaintiffs and Class Members to CAG, including attorney's fees and costs;

E.      Under Count III, for actual damages sustained by Plaintiffs and Class Members as a result of violations of the CROA, including any amounts paid by Plaintiffs and Class Members to CAG, including attorney's fees and costs;

F.      Under Count IV, for actual damages sustained by Plaintiffs and Class Members as a result of violations of California Code Section 1780 for actual damages, restitution, punitive damages, court costs and attorney's fees and any other relief the Court deems just and proper;

H.      Under Count V, for actual damages sustained by Plaintiffs and Class Members as a result of violations of California Code Section 17206 for actual damages, restitution, punitive damages, court costs and attorney's fees and any other relief the Court deems just and proper;

I.      Under Count VI, for actual damages sustained by Plaintiffs and Class Members as a result of violations of California Business and Professions Code for actual damages, restitution, punitive damages, court costs and attorney's fees and any other relief the Court deems just and proper;

J.  On all counts, for an award of the costs of suit incurred herein, including

expert witness fees;

K.  On all counts, for an award of interest, including prejudgment interest, at the

legal rate; and

L.  For such other and further relief as this Court deems just and proper.


## REQUEST FOR JURY TRIAL

Plaintiffs request a trial by jury on all issues.

Dated this 17th day of April, 2015.

**FISHER & KREKORIAN**

s/ R. Kevin Fisher
R. Kevin Fisher
California SBN 131455
P.O. Box 890
Santa Monica, CA 90406
(310) 862-1220 (telephone)
(310) 388-0805 (facsimile)

**SCHWABA LAW FIRM**

s/ Andrew J. Schwaba
Andrew J. Schwaba
NC Bar No.:  36455
212 North Tryon Street
Suite 1725
Charlotte, NC 28281
(704) 370-0220
(704) 370-0210 (fax)
aschwaba@verdictnc.com
*(pro hac vice motion to be filed)*

**NICHOLSON LAW FIRM, P.A.**

s/ Edward H. Nicholson, Jr.
Edward H. Nicholson, Jr.
NC Bar No. 36123
212 North Tryon Street
Suite 1725
Charlotte, NC 28281
(704) 331-3925 (telephone)
(704) 331-3950 (facsimile)
*(pro hac vice motion to be filed)*


*Attorneys for Plaintiffs*